ANTHONY J. AND JACQUELINE O. PASQUALINI, ET AL.,[1]
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 45377–86, 45507–86,
45508–86, 46096–86,
46466–86, 48955–86,
48956–86, 24165–87,
32279–87, 37626–87,
39093–87, 39094–87,
39095–87, 39096–87,
39535–87, 39541–87,
39603–87, 39604–87,
8692–89,  8702–89,
9332–89,  9391–89,
9394–89, 26140–89,
18463–90,  2011–91.

Filed July 18, 1994.

[1] The following cases are consolidated herewith for purposes of this proceeding: Arthur and Josephine Hassler, docket No. 45507–86; Donald J. and Marilyn L. Saltzman, docket No. 45508–86; Vincent Perito, docket No. 46096–86; Leroy and Diane Seacor, docket No. 46466–86; Raymond J. and Lucille Wendel, docket No. 48955–86; Raymond J. and Lucille Wendel, docket No. 48956–86; Mark and Carol Tendler, docket No. 24165–87; William and Lillian Marion, docket No. 32279–87; Vincent Perito, docket No. 37626–87; Kenneth and Judith A. Pfeil, docket No. 39093–87; David and Muriel Bloom, docket No. 39094–87; Joel H. and Rachelle Schartoff, docket No. 39095–87; Charles W. and Maryann Maeder, docket No. 39096–87; Emanuel M. and Susan R. Leaf, docket No. 39535–87; Emil W. and Yvonne Solimine, docket No. 39541–87; Joseph J. and Gloria P. Leonhard, docket No. 39603–87; Joseph and Carolyn Mangino, docket No. 39604–87; Peter M. and Dorothea M. Albano, docket No. 8692–89; Frederick G. and Kathryn Wendel, docket No. 8702–89; Barry and Christine Adler, docket No. 9332–89; Barry and Christine Adler, docket No. 9391–89; Barry Adler, docket No. 9394–89; Nicholas L. and Carol A. Ribis, docket No. 26140–89; Arthur and Josephine Hassler, docket No. 18463–90; Richard T. and Delores Wendel, docket No. 2011–91.

*Thaddeus A. Oberc, Harvey R. Poe, Gerald S. Rotunda, Robert J. Alter, Herbert L. Zuckerman,* and *Richard J. Sapinski*, for petitioners.

*William S. Garofalo* and *Brendan G. King*, for respondent.

COLVIN, *Judge*: Petitioners in these consolidated cases claimed charitable contribution deductions for the donation of a total of 180,000 Christmas cards to Catholic Charities. Respondent disallowed those deductions and determined income tax deficiencies, with additions to tax and increased interest as reflected in the appendix, *infra*. After concessions and our opinion in *Pasqualini v. Commissioner*, T.C. Memo. 1994–323, filed today, the sole issue for decision is whether, if petitioners had sold the Christmas cards, the gain would have been ordinary income, thus reducing petitioners' charitable contribution deductions pursuant to section 170(e)(1)(A). We hold that the gain would have been long-term capital gain if petitioners had sold the cards, and thus the section 170(e)(1)(A) limitation does not apply.

Section references are to the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure. The term "petitioners" generally does not include spouses of the persons who were actively involved in the transactions.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by reference the findings of fact in *Pasqualini v. Commissioner, supra*.

## 1. *Petitioners' Medical Goods Contributions*

This section relates to events that preceded petitioners' purchase and charitable contribution of the Christmas cards.

Petitioner Barry Adler (Adler) worked in the medical industry before and during the years at issue. In the late 1970s, Adler bought medical equipment at a bankruptcy auction and donated it to a hospital. Adler discussed making charitable contributions of medical equipment with his accountant, petitioner Donald Saltzman (Saltzman), after he contributed the equipment to the hospital.

In 1980, Adler and Saltzman began an arrangement in which Adler bought medical supplies and equipment at bankruptcy auctions for clients or members of the accounting firm. The goods were stored for 1 year and then donated primarily to West Hudson Hospital or Pan American Development Foundation. From 1980 to 1982, Adler bought medical goods to be donated by members and clients of the Albano, Leaf firm for which the donors claimed charitable contribution deductions of $3 to $4 million.

Petitioners Pasqualini, Hassler, Perito, Marion, Seacor, Raymond Wendel, Frederick Wendel, and Richard Wendel of the clients group and Pfeil, Maeder, Leaf, Albano, and Saltzman of the accountants group deducted charitable contributions of medical goods totaling $202,830 under this arrangement in 1982.[2]

## 2. *The Customs Service Auction of Christmas Cards*

On December 8, 1981, Adler went to a U.S. Customs Service (Customs Service) auction preview at the World Trade Center in New York City to buy medical equipment. While there, he saw Christmas cards with gold medallions among the property to be auctioned 2 days later. There were 10 lots of 18,000 cards each, for a total of 180,000 cards. The Customs Service auction catalogue stated that the cards were valued for import duty purposes at $10.50 each, for a total of $1,890,000.

Adler contacted Saltzman to ask whether the cards could be purchased and donated to obtain tax benefits. Saltzman said yes, if they found a charitable donee to use the cards in its normal operations. Adler contacted a friend of his, Hy

---

[2] Petitioners Hassler deducted a charitable contribution of medical goods in 1983.

Frankel (Frankel), who occasionally did work for Catholic Charities, Diocese of Brooklyn (Catholic Charities). Frankel said that Catholic Charities might be interested in the cards.

On December 10, 1981, Adler, Saltzman, and Emil Solimine purchased the 180,000 Christmas cards for $30,000 at the Customs Service auction. Adler paid for the cards to be delivered and stored in a warehouse, where they remained until they were delivered to Catholic Charities.

Petitioners have not dealt with Christmas cards or any similar property in any trade or business.

### 3. *Donation of the Cards to Catholic Charities*

After the auction, Frankel referred Adler to Thomas DeStefano (DeStefano), the Executive Director of Catholic Charities. Catholic Charities is tax exempt under section 501(c)(3). DeStefano told Frankel that Catholic Charities could use the cards to distribute to its parishes. Shortly after the auction, Catholic Charities agreed to accept the cards.

Petitioners held the cards for more than 1 year. Around December 27, 1982, petitioners donated the cards to Catholic Charities.

### 4. *Petitioners' 1982 Tax Returns*

Petitioners each claimed a deduction on their 1982 tax returns for a charitable contribution of the Christmas cards based on the Customs Service value of $1,890,000 ($10.50 per card). Deductions that exceeded the percentage limitations in section 170(d) were carried forward to tax year 1983 or later.

OPINION

### 1. *Limitation on Charitable Contribution If Property Donated Would Have Been Ordinary Income Property If Sold*

A charitable contribution deduction is reduced by any gain that would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value. Sec. 170(e)(1)(A).[3] Thus, in deciding the

---

[3] Sec. 170(e)(1)(A) provides:

(1) GENERAL RULE.—The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—

(A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * *

amount of petitioners' charitable contribution deductions, we must decide whether a sale of the Christmas cards by petitioners would have produced long-term capital gain or ordinary income.[4] The sale of property does not produce long-term capital gain for a taxpayer in whose hands the property is inventory. Sec. 1221(1).[5] If section 170(e)(1)(A) applies, petitioners' charitable contribution deductions would be limited to their cost bases in the cards. To apply section 170(e)(1)(A), we view the contribution of 180,000 Christmas cards to Catholic Charities as if petitioners had sold them for $67,500, the amount we have found to be their fair market value at the time of the contribution. See *Pasqualini v. Commissioner*, T.C. Memo. 1994–323.

Respondent argues that petitioners' charitable contribution deductions should be limited to petitioners' cost bases in the cards. Respondent contends that the cards are the inventory of a charitable donation venture because they were purchased and held to contribute to charity and thus were ordinary income property for purposes of section 170(e)(1)(A).

Petitioners argue that the donation of property, even in large quantities, does not transform an investor into a dealer for purposes of section 170(e)(1)(A). Petitioners rely on *Sandler v. Commissioner*, T.C. Memo. 1986–451, and *Hunter v. Commissioner*, T.C. Memo. 1986–308, for this proposition. In *Sandler*, the taxpayer bought gravesites to donate to a church three times in 5 years. In *Hunter*, the taxpayers bought limited edition prints to donate to charitable institutions. In *Sandler* we held that the section 170(e)(1)(A) limitation did not apply absent a finding that the donor actually engaged in the trade or business of selling property like the donated property to customers. See also *Hunter v. Commissioner, supra*. We conclude that *Sandler* and *Hunter* do not compel a decision for petitioners on this fact-specific issue.

---

[4] During the time in issue, the holding period for long-term capital gain was 1 year. Sec. 1222. The parties agree that petitioners held the cards for more than 1 year. If the cards were capital assets in petitioners' hands, they would have produced long-term capital gain if sold.

[5] Sec. 1221(1) excludes from capital asset classification:

stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

## 2. *Whether the Christmas Cards Were Ordinary Income Property*

The parties agree that we should apply section 1221(1) to decide whether the Christmas cards, if sold, would have been capital assets or ordinary income property, but they disagree about what that analysis shows.

Whether property is held by a taxpayer primarily for sale to customers in the ordinary course of business is a question of fact. *Pleasant Summit Land Corp. v. Commissioner*, 863 F.2d 263, 270 (3d Cir. 1988), affg. on this issue and revg. in part T.C. Memo. 1987–469; *S&H, Inc. v. Commissioner*, 78 T.C. 234, 242 (1982). Courts consider numerous factors in deciding this issue, and no one factor controls. *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 415 (5th Cir. 1976). Petitioners bear the burden of proving that their property was not so held. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).

The following factors are among those which indicate whether property is held primarily for sale to customers in the ordinary course of a trade or business: (1) The frequency and continuity of sales; (2) the extent and substantiality of sales; (3) the purpose for which the taxpayer acquired and held the property; (4) the time between purchase and sale; (5) the extent of improvements made to facilitate its sale; and (6) the taxpayer's advertising and promotion efforts. *Pleasant Summit Land Corp. v. Commissioner, supra* at 271; *Kaltreider v. Commissioner*, 255 F.2d 833, 838 (3d Cir. 1958), affg. 28 T.C. 121 (1957); *Guardian Indus. v. Commissioner*, 97 T.C. 308, 316–317 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994). We will consider these factors here to decide whether, if petitioners had sold the cards, the sales would have given rise to ordinary income.

### a. *Number, Frequency, and Substantiality of Sales (Factors 1 and 2)*

The frequency and substantiality of sales is the most important factor in deciding whether property is held for sale to customers. *Suburban Realty Co. v. United States*, 615 F.2d 171, 176 (5th Cir. 1980); *Houston Endowment, Inc. v. United States*, 606 F.2d 77, 81 (5th Cir. 1979); *Biedenharn Realty Co. v. United States, supra* at 416, 419; *Guardian Indus. v.*

*Commissioner, supra* at 320; *Buono v. Commissioner*, 74 T.C. 187, 200 (1980) ("lack of frequent sales" is the most important factor for characterizing the taxpayer's gain). Petitioners made one contribution of Christmas cards in the years at issue. To apply section 170(e)(1)(A), we deem petitioners to have sold the cards for a total of $67,500. The fact that petitioners made only one gift of cards each, worth a total of $67,500, suggests they should not be viewed as dealers for purposes of section 170(e)(1)(A). Even if we consider their contributions of medical equipment,[6] petitioners did not make charitable contributions frequently.

### b. *Purpose of Acquisition and Duration of Ownership (Factors 3 and 4)*

Petitioners undisputedly met the 1-year holding period of section 1222; however, they bought the cards to donate to charity and not for appreciation. On balance, this factor favors respondent. *S&H, Inc. v. Commissioner*, 78 T.C. 234, 244 (1982) (warehouse built for transfer to a specific customer pursuant to a preexisting arrangement was property held for sale in ordinary course of business and was not held for investment).

### c. *Promotional Activities and Improvements to Property (Factors 5 and 6)*

Petitioners made no improvements to the cards (such as supplying envelopes for them, removing them from the outer folder, or packaging them in a form suitable for retail sales), did no advertising, and made relatively little effort to arrange the gift of the cards to Catholic Charities. This factor favors petitioners.

We conclude that, on balance, the factors show that, if petitioners had sold the cards at their fair market value rather than donated them, the gain would have been long-term capital gain.[7] Sec. 170(e)(1)(A).

Respondent points out that the Internal Revenue Service has ruled that a donor who is not actively engaged in a trade or business and who makes a large number of charitable con-

---

[6] In 1982, petitioners averaged slightly more than one contribution of medical equipment each.

[7] Cf. *Lindsley v. Commissioner*, T.C. Memo. 1983–729 (donation of five parcels of land by real estate broker was subject to sec. 170(e)(1)(A) limitation because property would have given rise to ordinary income if it had been sold by the taxpayer).

tributions may be engaged in activities that are substantially equivalent to the activities of a dealer, particularly if the donor makes the contributions after holding the property the minimum time required to meet the long-term capital gain holding requirement. Rev. Rul. 79–256, 1979–2 C.B. 105; Rev. Rul. 79–419, 1979–2 C.B. 107. However, respondent's reliance on the rulings is misplaced because application of the factors considered in deciding whether property is held for investment is inherently factual. Also, the revenue rulings (unlike respondent's litigation position here) at best only selectively consider those factors.[8]

We conclude that the section 170(e)(1)(A) limitation does not apply, and that petitioners may deduct a total of $67,500 as a charitable contribution.

*Decisions will be entered under Rule 155.*

---

APPENDIX

| | | | Additions to tax | |
|---|---|---|---|---|
| *Petitioner* | *Year* | *Deficiency* | *Sec. 6653(a)(1)* | *Sec. 6653(a)(2)* |
| Pasqualini | 1982 | $21,570.16 | $1,078.51 | 1 |
| Hassler | 1982 | 32,147.00 | 1,607.35 | 1 |
| | 1983 | 13,640.50 | 682.03 | 1 |
| | 1984 | 7,456.00 | 372.80 | 1 |
| Saltzman | 1982 | 5,383.00 | 269.15 | 1 |
| Seacor | 1982 | 28,404.00 | 1,420.20 | 1 |
| Perito | 1982 | 18,942.00 | 947.10 | 1 |
| | 1983 | 8,608.00 | 430.00 | 1 |
| Ray. Wendel | 1982 | 5,710.00 | 974.00 | - - - |
| | 1983 | 17,700.00 | 885.00 | 1 |
| Tendler | 1982 | 2,821.00 | 141.05 | 1 |
| Marion | 1982 | 32,335.00 | 1,617.00 | 1 |
| Pfeil | 1982 | 4,474.00 | 223.70 | 1 |
| Bloom | 1982 | 3,380.00 | 169.00 | 1 |
| Schartoff | 1982 | 2,293.00 | 114.65 | 1 |
| Maeder | 1982 | 3,602.00 | 180.10 | 1 |
| Leaf | 1982 | 9,329.00 | 466.45 | 1 |
| Leonhard | 1982 | 2,590.00 | 129.50 | 1 |

---

[8] We generally treat a revenue ruling as merely the Commissioner's position with respect to a specific factual situation. *Tandy Corp. v. Commissioner*, 92 T.C. 1165, 1170 (1989) (citing *Stark v. Commissioner*, 86 T.C. 243, 250–251 (1986)); see *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Crow v. Commissioner*, 85 T.C. 376, 389 (1985).

| | | | Additions to tax | |
|---|---|---|---|---|
| Petitioner | Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| Mangino | 1982 | 33,233.00 | 1,661.65 | [1] |
| Albano | 1982 | 8,985.00 | 449.25 | [1] |
| | 1983 | 7,565.00 | 378.25 | [1] |
| | 1984 | 1,943.00 | 97.15 | [1] |
| Fred. Wendel | 1982 | 14,330.00 | 716.50 | [1] |
| | 1983 | 21,560.00 | 1,078.00 | [1] |
| | 1984 | 4,205.00 | 210.25 | [1] |
| Adler | 1982 | 28,764.00 | 1,438.20 | [1] |
| | 1984 | 22,934.00 | 2,002.30 | [1] |
| | 1985 | 15,516.66 | 1,265.53 | [1] |
| Ribis | 1983 | 6,731.00 | 336.55 | [1] |
| Rich. Wendel | 1982 | 10,178.00 | 919.00 | [1] |
| Solimine | 1982 | 94,500.00 | 4,725.00 | [1] |

[1] 50 percent of the interest due on the portion of the underpayment attributable to negligence.

| | | | Additions to tax | | Increased interest |
|---|---|---|---|---|---|
| Petitioner | Year | Sec. 6651(a) | Sec. 6659 | Sec. 6661 | Sec. 6621(c) |
| Pasqualini | 1982 | - - - | $3,925.30 | $848.58 | [1] |
| Hassler | 1982 | - - - | 8,916.60 | 3,214.70 | [1] |
| | 1983 | - - - | 4,092.15 | [2] | [1] |
| | 1984 | - - - | 2,236.80 | [2] | [1] |
| Saltzman | 1982 | - - - | 1,384.20 | 77.00 | [1] |
| Seacor | 1982 | - - - | 7,585.50 | - - - | [1] |
| Perito | 1982 | - - - | - - - | 1,894.20 | [1] |
| | 1983 | - - - | - - - | 2,152.00 | [1] |
| Ray. Wendel | 1982 | - - - | - - - | - - - | - - - |
| | 1983 | $4,358.00 | - - - | - - - | [1] |
| Tendler | 1982 | - - - | 846.30 | - - - | [1] |
| Marion | 1982 | - - - | 9,700.00 | [2] | [1] |
| Pfeil | 1982 | - - - | 1,342.00 | - - - | [1] |
| Bloom | 1982 | - - - | 1,014.00 | - - - | [1] |
| Schartoff | 1982 | - - - | 687.90 | - - - | [1] |
| Maeder | 1982 | - - - | 1,080.60 | - - - | [1] |
| Leaf | 1982 | - - - | 2,798.70 | [2] | [1] |
| Leonhard | 1982 | - - - | 777.00 | - - - | [1] |
| Mangino | 1982 | - - - | 9,969.90 | [2] | [1] |
| Albano | 1982 | - - - | 2,695.50 | [2] | [1] |
| | 1983 | - - - | 2,269.50 | [2] | [1] |
| | 1984 | - - - | 582.90 | - - - | [1] |
| Fred. Wendel | 1982 | - - - | 4,299.00 | [2] | [1] |
| | 1983 | - - - | 6,468.00 | [2] | [1] |
| | 1984 | - - - | 1,261.50 | - - - | [1] |
| Adler | 1982 | - - - | 8,629.20 | [2] | [1] |

| Petitioner | Year | Sec. 6651(a) | Additions to tax Sec. 6659 | Sec. 6661 | Increased interest Sec. 6621(c) |
|---|---|---|---|---|---|
| | 1984 | 2,293.40 | 6,880.20 | [2] | [1] |
| | 1985 | 1,018.46 | 4,654.99 | [2] | [1] |
| Ribis | 1983 | - - - | 1,926.30 | [2] | [1] |
| Rich. Wendel | 1982 | - - - | 5,514.00 | [2] | [1] |
| Solimine | 1982 | - - - | 28,350.00 | [2] | [1] |

[1] 120 percent of the regular interest due on the deficiency.
[2] Sec. 6661 is asserted in the alternative to sec. 6659.